FILED

2006 Oct-02  PM 03:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MIRANDA SUMERLIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CV 05-B-1067-S** |
| | ) | |
| **AMSOUTH BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 17.) Plaintiff Miranda Sumerlin has sued her former employer, defendant AmSouth Bank, alleging that defendant discriminated against her on the basis of her race. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 17), is due to be granted.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its

burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.   Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255.   Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  STATEMENT OF FACTS

In February 2001, plaintiff began working on a temporary assignment with defendant. (Doc. 18, Ex. 1 at 44, 48, and ex. 2.)  Defendant hired her into a permanent position, File Clerk, on July 2, 2001.  (*Id*. at 67-68.)   About three months later, defendant promoted plaintiff to the position of Payroll Representative in the Human Resources Department.  (*Id*. at 69; *id*., Ex. 2 at 83.)  During plaintiff's tenure, seven other Payroll Representatives worked in the Human Resources Department: Leanne Aaron, white; Tracie Ash, African-American;

2

Kim Blackmon, white; Emily Hilton, white; Sharon Montgomery, African-American; Cindy Whitfield, white; and LaDonna [last name unknown], African-American. (*Id.*, Ex. 1 at 66, 71-72, 84-86, 88.) All of the Payroll Representatives, except Emily Hilton, had more seniority than plaintiff. (*Id.* at 89-90.)

None of the Payroll Representatives performed the same job tasks. (*Id.*, Ex. 1 at 89; *id.*, Ex. 2 at 115-16.) Plaintiff's job duties included, but were not limited to, entering overtime and name/address changes, and filing. (*Id.* at 91; *id.*, Ex. 2 at 99.) Hilton's job duties included, but were not limited to, balancing payroll accounting and verifying employment. (*Id.*, Ex. 2 at 98-99.) Defendant paid Hilton more than it paid plaintiff. (*Id.*, Ex. 1 at 86-87.)

As a financial institution, defendant is obligated to monitor its accounts to ensure that its employees and customers are not using their accounts for illegal purposes. (*Id.* at 110, 134, *id.*, Ex. 4 ¶ 1; *id.*, Ex. 8 at 3-4, 7-8.) Plaintiff was aware of these policies. (*Id.* at 8.) As part of its routine monitoring for illegal activity, defendant ran a monthly report, called the Employee Kiting Suspect List, which listed the accounts of employees that, in the previous month, had made ten or more deposits, excluding payroll deposits and automated deposits, totaling greater than $3,000.00. (*Id.*, Ex. 4 ¶ 2.) The report does not indicate the race of any listed employee account holder. (*Id.* ¶ 10.)

Forty-eight accounts appeared on the December 2004 report, including plaintiff's personal checking account. (*Id.* ¶ 2.) At that time, plaintiff had three accounts with

defendant:  (1) a joint personal checking account with her husband, (2) a savings account, and (3) a business account in the name "Kevin and Miranda Barber and Style Shop."  (*Id.*, Ex. 1 at 107-108.)  The report showed that plaintiff had made over ten cash deposits totaling more than $3,000 into the personal checking account during the previous reporting period. (*Id.*, Ex. 4 ¶ 4.)  On the basis of the report, defendant's Internal Theft Unit asked the Regional Security Manager of Corporate Security, Sherry Hilyer, white, to investigate.  (*Id.* ¶ 8.)  Upon further review of plaintiff's account activities, defendant found that plaintiff had deposited more than $10,000 in cash into her accounts between November 1, 2004 and December 6, 2004. (*Id.* ¶ 9.)  From April 1, 2004, to December 6, 2004, plaintiff had deposited more than $32,000 in cash into her accounts.  *Id.*

On January 3, 2005, Andrea McCaskey, African-American, Vice President of Employee Relations, called plaintiff to her office.  (*Id.*, Ex. 1 at 108; *id.*, Ex. 2 at 7.)  When plaintiff arrived, McCaskey told her someone needed to speak with her in the conference room.  (*Id.*, Ex. 1 at 109.)  McCaskey escorted plaintiff to the conference room and then left. (*Id.* at 109-10.)

Hilyer and Mike Wallace, white,  a Corporate Security Investigator, were waiting for plaintiff in the conference room.  (*Id.* at 110; *id.*, Ex. 6 ¶ 1.)  They told her that they were Investigators in the Corporate Security Department and that they were investigating activity in her accounts.  (*Id.*, Ex. 1 at 109-10; *id.*, Ex. 5 ¶ 4; *id.*, Ex. 6 ¶ 1.)  Hilyer told plaintiff that defendant monitored employees' accounts.  (*Id.*, Ex. 1 at 110.)  Then, she stated that they

4

were aware that plaintiff had deposited more than $10,000 in cash into her accounts during the months of November and December of 2004, and that they needed to know the source of those cash deposits. (*Id.*, Ex. 1 at 110.)

Plaintiff told Hilyer that her mother had given her a cashier's check for $24,000, which she had deposited into her personal checking account. (*Id.* at 110-11, 204, 207.) Hilyer and Wallace advised plaintiff that they were not concerned about the source of a cashier's check she had deposited, but only about the source of the cash she had deposited.[1] (*Id.* at 111; *id.*, Ex. 5 ¶ 5; *id.*, Ex. 6 ¶ 4.) Plaintiff told the investigators that she and her husband owned two businesses, a barber shop and a detail shop. (*Id.*, Ex. 1 at 111.) Hilyer asked plaintiff how much both businesses earned. (*Id*, Ex. 1 at 111-12; *id.*, Ex. 5 ¶¶ 7-10; *id.*, Ex. 6 ¶¶ 7-8, 10.) She also asked plaintiff to provide her with records to support the source of the cash deposits, and tax records for the last two to three years. (*Id.*, Ex. 1 at 113; *id.*, Ex. 5 ¶ 11; *id.*, Ex. 6 ¶ 11; *id.*, Ex. 8 at 4.) Plaintiff told Hilyer that she would see what she could find. (*Id.*, Ex. 5 ¶ 11; *id.*, Ex. 8 at 4.) However, when asked by Hilyer for the tax records of the detail shop, plaintiff told her that "it was not her business." (*Id.*, Ex. 1 at 131.)

---

[1]In her deposition, plaintiff testified that she had deposited the cashier's check from her mother and then withdrawn $15,000 in cash and placed it in a safe deposit box. (Doc. 18, Ex. 1 at 207-08.) She testified that her husband would remove cash from the safe deposit box and deposit it into their account as needed. (*Id.* at 206-07.) Plaintiff never told defendant during its investigation that this was the source of her cash deposits in November and December, (*id.*, Ex. 5 ¶ 16, Ex. 6 ¶ 5, and Ex. 7 ¶ 8), and she has not offered any bank records to show the $15,000 withdrawal from her checking account or to show a correlation between activity in her checking account and activity with the safe deposit box.

At or near the conclusion of this interview, Hilyer asked plaintiff to write a statement verifying the source of the cash deposits.  (*Id.*, Ex. 1 at 114, 148-149 and ex. 9.)  Plaintiff complied, and she wrote:

> I, Miranda Sumerlin[, am] stating that I received $500.00 a week from my Barber and Beauty Shop.  I also receive $500.00 to $700.00 a week from my detail shop.  The monies from the detail shop various [sic] depending on the weather.  I also put money into my account from different resources.

(*Id*, ex. 9.)

Approximately a week after the interview, plaintiff had not produced any business records and McCaskey contacted her again.  (*Id.*, Ex. 1 at 135; *id.*, Ex. 2 at 20-22; *id.*, Ex. 8 at 4.)  During the conversation, McCaskey asked plaintiff "to please find something that she could show them," (*id.*, Ex. 8 at 4), and she told plaintiff to cooperate with the investigation, (*id.*, Ex. 1 at 135).  McCaskey testified:

> I wanted to make sure that she understood that it was very serious, that the allegation against her was very serious.  And we wanted to make sure we had whatever documentation security needed to show them where all of the money was coming from, so . . . she would be able to clear her name and there would be no question and her employment could continue.

(*Id.*, Ex. 2 at 22.)

On January 19, 2005, plaintiff met again with Hilyer.  (*Id.*, Ex. 1 at 116.)  During this interview, Forrest Duncan, white, a Corporate Security Investigator, was present.  (*Id.*; *id.*, Ex. 5 ¶ 14; *id.*, Ex. 7 ¶ 3.)  They asked plaintiff to write a statement concerning the source of her cash deposits.  (*Id.*, Ex. 1 at 116-17, 148-49 and ex. 9.)  In this statement, plaintiff wrote:

> I, Miranda Sumerlin[, do] not agree with Sherry Hilyer interview. I have explained to her about the funds that [are] going into my account. I told her that I have records from the cashier check. This check was given to me by my mother. My mom purchase[d] a car from me. I have [given] her all the information about these funds. I think that she wants to believe what she wants to believe. Sherry has this attitude that I'm lying, but I told her that we only take cash and that's why she show[s] this amount in.

(*Id.*, ex. 9.) Plaintiff did not produce any receipts or other business records for the barber shop or the detail shop to verify the income of these two cash business. (*Id.*, Ex. 5 ¶¶ 13, 15.) Plaintiff testified that she had refused to give Hilyer the records. (*Id.*, Ex. 1 at 146-47.)

Plaintiff told Hilyer that the detail shop reported income of $10,000 in 2003, and the barber shop, which opened in August 2004, produced $500 per month. (*Id.*, ex. 10; *id.*, Ex. 5 ¶¶ 8, 10.) Plaintiff deposited more than $10,000 in cash into her accounts between November 1, 2004 and December 6, 2004; and more than $32,000 in cash between April 1, 2004 and December 6, 2004. (*Id.*, Ex. 4 ¶ 9.) This amount of cash was triple the income of the detail shop the previous year and far exceeded the monthly income from the barber shop.

According to plaintiff, during her January 19, 2003 meeting with Hilyer, she asked Hilyer why she was being questioned, and Hilyer responded that she was being questioned because she was black, worked in payroll and should not be able to put that kind of money into her account.[2] (*Id.*, Ex. 1 at 117-18.)

---

[2]Hilyer and Duncan deny that Hilyer made such a remark. (Doc. 18, Ex. 5 ¶ 19; *id*, Ex. 7 ¶ 13.) However, for purposes of summary judgment, the court will assume Hilyer made the remark. *See Liberty Lobby*, 477 U.S. at 255.

7

Following this meeting, Hilyer reported to Bill Burch, Head of Corporate Security, and Burch and Hilyer discussed the results of the investigation with McCaskey. (*Id.*, Ex. 2 at 13-14, 16-17.) Based on this information, McCaskey and her supervisor, Lisa Mead, Senior Vice-President of Corporate Employee Relations, (*id.* at 9), decided to terminate plaintiff, (*id.* at 13, 17-18.) McCaskey told plaintiff, "Based on the results of the investigation and your refusal to cooperate with the investigation, we have no other [option] but to terminate you." (*Id.* at 20.)

McCaskey testified that she and Mead had decided to terminate plaintiff because "[s]he did not show where that money came from, and that was part of the investigation." (*Id.* at 110.) She testified:

> My understanding from the investigative notes is that when asked to provide business documentation, which could include a tax return, she said, ["]I'll see what I can provide.["] When asked why she did not provide that, she said it wasn't the bank's business, not that she didn't have the documentation.

(*Id.* at 111.)

Following her discharge, plaintiff sought unemployment compensation benefits. (*Id.*, Ex. 1 at 32, 219.) She was initially awarded unemployment compensation benefits; thereafter, defendant appealed. (*Id.* at 219.) During the hearing on defendant's appeal, plaintiff testified that Hilyer had asked for her tax returns and that she had told Hilyer that was "not her concern." (*Id.*, Ex. 8 at 6.) McCaskey testified during the hearing that she had asked plaintiff to provide "some documentation" to show the source of the cash deposits."

(*Id*. at 4.)  Plaintiff testified that Hilyer had asked for her tax records for two to three years.

(*Id*. at 6.)  She testified that she did not give Hilyer these records "[b]ecause it was not her

concern;"  she stated:

> This was really a bigger issue then [sic] what [McCaskey] is stating and I really don't want to go into details because I don't have my attorney but the information that she asked, it was personal and like I said it was a bigger issue then [sic] what she stated.

(*Id*.; *see also id*, Ex. 1 at 221-22.)

After the hearing, the Department of Industrial Relations found, "The claimant refused

to supply all requested documents to show the source of those cash deposits"  (*Id*., Ex. 1, ex.

17.)  It held:

> Employers may reasonably expect that employees will cooperate fully with all inquires intended to comply with Federal Laws and Regulations.  The evidence presented at this hearing shows the claimant displayed a disregard for that standard of behavior committing what would be considered misconduct connected with the work.   Since the evidence shows the claimant was discharged as a result of this misconduct, she would be correctly subject to disqualifications under the provisions of [Ala. Code,] Section 25-4-78(3.)

(*Id*.)

Plaintiff did not mention Hilyer's alleged comment regarding her race during the

unemployment proceedings.  (*Id*., Ex. 1 at 220-21; *id*., Ex. 8.)  Plaintiff filed an application

for leave to appeal the decision to the State Board of Appeals, which was denied.  (*Id*., Ex.

1 at 224-25 and ex. 18.)  Thereafter, plaintiff filed an appeal in the Circuit Court for Jefferson

County, Alabama.  (*Id*. at 223-24.)

On January 21, 2005, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission.  (*Id.*, Ex. 1 at 156-57 and ex. 11.)  In her Charge, plaintiff alleged that she had "cooperated with [her] employer and explained how and where [her] deposits originated."  (*Id*. at 156-57, 165-66 and ex. 11.)  Plaintiff stated in her Charge Questionnaire that Hilyer had "made racial remarks about what she couldn't do."  (*Id.* at 156-57 and ex. 12 at 3.)

Plaintiff contends that defendant has "changed" its explanation for investigating her. (Doc. 24 ¶¶ 3, 4.)  In her Response, plaintiff argues:

> Before this lawsuit was filed, the Defendant supported its decision to terminate Ms. Sumerlin by listing the transactions which led to her investigation.[3]  Those transactions according to the Defendant at that time, took place in connection with her employee account from April of 2004 until October 2004.
>
> . . .

---

[3]Defendant wrote plaintiff's then counsel in response to counsel's submission of an authorization for plaintiff's account information.   (Doc. 18, Ex. 2, ex. 2.)  In response, defendant wrote:

> Attached hereto is a summary of cash deposits into Ms. [Sumerlin]'s employee account.  This activity was picked up by reports which are monitored by a division of Corporate Security.  When questioned about these deposits, Ms. [Summerlin]'s explanation changed three times.  She also refused to provide any documentation to support her stories even after Andrea McCaskey of human resources explained to her that failing to do so would adversely affect her job.

(*Id*.)  The attached summary included deposits for the months of April 2004 through October 2004.  (*Id*., attach.)

> After this lawsuit was filed, the Defendant changed its explanation, asserting that the transactions which led to the investigation took place in November, 2004 – a month not mentioned in its earlier correspondence which was specifically written to explain and support its decision to terminate Ms. Sumerlin.

(Doc. 24, ¶¶ 3, 5 [citing doc. 18 at 49-50, 56, and ex. 2](footnote supplied).)  However, in her deposition, plaintiff admitted that she was told she was being investigated because of her cash deposits made in November and December 2004.  (*Id*., Ex. 1 at 110 ("But [Hilyer] said that we monitor customers' and employees' accounts, and you put a lot of money in your account for November and December of 2004, in your personal and your business account."); *id*. at 167 (same); *id*. at 217-18 (plaintiff testified that McCaskey told her that she needed documentation for November and December).)  The court finds that the letter to plaintiff's former counsel does not support an inference that defendant has changed its explanation of the reason plaintiff was investigated.

On June 21, 2005, plaintiff filed an Amended Complaint alleging race discrimination with regard to her pay and her termination in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981.  (Doc. 3 ¶¶ 31-34.)

### III.  DISCUSSION

### A.  PAY CLAIMS

In her Amended Complaint, plaintiff alleges, "Caucasian employees who are similarly situated to Plaintiff were paid more than Plaintiff[;] Emily Hilton [is] an example."  (Doc. 3 ¶ 29.)  Defendant contends that summary judgment is due to be granted and plaintiff's pay

claims are due to be dismissed on the grounds that (1) her Title VII pay claims are time-barred, (2) she cannot establish a *prima facie* case of intentional race discrimination with regard to her pay, and (3) she cannot establish that defendant's articulated reason for the difference in pay is unworthy of credence.  In her Opposition, plaintiff states that she "does not oppose Defendant's motion to the extent it seeks dismissal of her Title VII disparate pay claims;" she does, however, oppose defendant's Motion for Summary Judgment as to her § 1981 pay claim.  (Doc. 24, 1 n.1, 9.)

"[T]he *McDonnell Douglas/Burdine* approach to disparate treatment is the appropriate framework for evaluating . . . [a] claim of [race-based] wage discrimination."  *See Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528 (11th Cir. 1992), *cited in Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004).  The *McDonnell Douglas* framework for establishing a prima facie case is used in intentional discrimination cases brought under either Title VII or Section 1981."  *Cooper*, 390 F.3d 695, 724 n.16 (11th Cir. 2004)(citing *Sledge v. Goodyear Dunlop Tires N.A., Ltd.*, 275 F.3d 1014, 1015 n.1 (11th Cir. 2001).

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory-treatment cases.  First, the plaintiff must establish a prima facie case of discrimination.  . . .  The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was [paid less], or someone else was [paid more], for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment.  [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was [paid less for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43(2000)(internal citations and quotations omitted.)

"To state a prima facie case of intentional discrimination in compensation, a plaintiff must establish that (1) she belongs to a racial minority; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage."  *Cooper*, 390 F.3d at 734-35 (citations omitted).  "The comparators must perform jobs similar to the plaintiff's; thus, the plaintiff must show that, in her job, she shared the same type of tasks as the comparators."  *Id*. at 735 (citing *Miranda*, 975 F.2d at 1529).

In this case, defendant has presented evidence that plaintiff and Hilton performed different tasks.  Plaintiff testified that her job duties included "overtime," entering "advanced pay, reporter absence, dock pay, address changes," and filing.  (Doc. 18, Ex. 1 at 91.)  Hilton balanced payroll accounts and verified employment.  (*Id*., Ex. 2 at 98.)  Plaintiff testified that all of the Payroll Representatives "had different duties."  (*Id*., Ex. 1 at 89.)

13

In response to defendant's Motion for Summary Judgment, plaintiff contends –

> Under the law, Ms. Sumerlin is not required to establish that she had the exact same job as did Ms. Hilton; she need only show the two jobs were similar. She has done this by demonstrating that the two jobs were in the same department, had the exact same title and reported to the same manager. Both jobs dealt with personnel payroll matters within the Human Resources department. These facts demonstrate the two jobs were similar.

(Doc. 24 at 9.) Plaintiff's response does not address defendant's contention, supported by evidence, that she performed tasks different from those performed by Hilton. The facts that the positions had the same job title, reported to the same manager in the same department, and had job duties generally related to payroll do not dispute defendant's evidence that plaintiff and Hilton performed different tasks in the Human Resources Department.

Because plaintiff has not demonstrated an issue of fact as to whether she and Hilton "shared the same type of tasks," *Cooper*, 390 F.3d at 735, she has not established that she and Hilton were similarly situated. Plaintiff has not offered evidence of another similarly-situated white employee that defendant treated more favorably with regard to pay. Without evidence of a similarly-situated employee outside the protected class that was treated more favorably than plaintiff with regard to pay, plaintiff cannot establish a prima facie case of race discrimination with regard to her pay, and such claim is due to be dismissed.[4]

---

[4]Because the court finds that plaintiff has not established a prima facie case of pay discrimination, the court pretermits discussion of whether plaintiff can establish that defendant's articulated reasons for the difference in pay are a pretext for unlawful race discrimination.

## B. TERMINATION
### 1. Direct Evidence

Plaintiff alleges that she has direct evidence of race discrimination with regard to her termination.  As direct evidence, she points to her deposition testimony that, when she asked Hilyer why she was being investigated, Hilyer responded that she was investigating plaintiff because she was black and worked in payroll and thus should not have been able to deposit a large sum of money into her account.  (Doc. 24 at 10 (citing doc. 18, Ex. 1 at 117-18).) Defendant contends that Hilyer's statement is not direct evidence, and the court agrees.

"Direct evidence is '[e]vidence, which if believed, proves existence of fact in issue *without inference or presumption*.'" *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987)(quoting BLACK'S LAW DICTIONARY 413 (5th ed. 1979)(Emphasis in original.)  "For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision.  Remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1105 (11th Cir. 2001)(quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *Trotter v. Bd. of Trustees*, 91 F.3d 1449, 1453-54 (11th Cir. 1996))(internal quotations omitted.)

The decision to terminate plaintiff was made by McCaskey and Mead.  Although the decision to terminate plaintiff was allegedly based on plaintiff's failure to cooperate in an investigation in which Hilyer was involved, the investigation itself was not initiated by Hilyer

15

but by a computer-generated report of particularized activity in employees' accounts. Moreover, McCaskey was independently aware of the fact that plaintiff had not provided documentation from her businesses to support the cash deposits.

Therefore, the court finds that Hilyer's alleged comment – plaintiff was investigated because of her race – is not direct evidence that plaintiff was terminated because she is African-American.

### 2. Circumstantial Evidence

In this circuit,

> Where direct evidence of discrimination is absent, a plaintiff establishes a circumstantial, prima facie case of racial discrimination based on disparate treatment by showing several things: '(1) [she] belongs to a racial minority; (2) [she] was subjected to adverse job action; (3) [her] employer treated similarly situated employees outside [her] classification more favorably; and (4) [she] was qualified to do the job.'"

*Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)(quoting *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006). In *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984), the Eleventh Circuit Court of Appeals held that a plaintiff can establish that an employer treated similarly-situated employees outside her protected class more favorably by showing either she was "replaced by one outside the protected class;" or, that she was disciplined more harshly than one outside the protected class for nearly identical conduct. *Nix*, 738 F.2d at 1185; *see also Burke-Fowler*, 447 F.3d at 1323 ("When a plaintiff alleges

discriminatory discipline, to determine whether employees are similarly situated, [the court] evaluates 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'")(quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).

In this case, plaintiff contends –

Ms. Sumerlin has established evidence creating an inference of race discrimination through her testimony (1) that the investigator who was the sole source of information relied upon for her termination made clearly discriminatory comments to her during the course of the investigation and (2) that immediately after challenging the investigator's authority for having made the comment, she was terminated. When coupled with the Defendant's changing reasons for commencing the investigation and its baseless assertion that Ms. Sumerlin failed to provide any explanation or documentation for her financial transactions, a reasonable jury could easily infer that race discrimination exists in this case.

(Doc. 24 at 11.) She offers no evidence of the comparative treatment of similarly situated employees; therefore, she has not established a prima facie case of race discrimination with regard to her termination. *See Nix*, 738 F.2d at 1185.

However, "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Richardson v. Leeds Police Dept.*, 71 F.3d 801, 806 (11th Cir. 1995)(quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

The Supreme Court has repeatedly stated that "[t]he *prima facie* case method established in *McDonnell Douglas* was '**never intended to be rigid, mechanized, or ritualistic**. Rather it is merely *a* sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."

17

*Underwood v. Perry County Commission*, 452 F.3d 1258, 1262 (11th Cir. 2006)(quoting

*United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)(quoting

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)))(emphasis in *Underwood*).

Nevertheless, "the plaintiff ***must*** show that [her] employer treated similarly situated

employees outside [her] classification more favorably than herself. . . . If a plaintiff fails to

show the existence of a similarly situated employee, summary judgment is appropriate where

***no other evidence of discrimination is present***. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th

Cir. 1997)(original emphasis and citations omitted; emphasis added).

The court has considered the evidence plaintiff claims supports an inference that she

was terminated because of her race – Hilyer's alleged comment that plaintiff was investigated

because of her race and the timing of her termination – and finds that such evidence is not

sufficient to support an inference that McCaskey and Mead terminated plaintiff because of

her race.

The record contains no evidence that plaintiff was investigated because of her race,

as she alleges Hilyer told her.  Instead, the record shows that plaintiff was investigated

because her account was on the monthly report, which was generated by routine, race-neutral

bank procedures.  Moreover, although there is evidence that Hilyer reported that plaintiff had

not cooperated in the investigation after the investigation was completed, McCaskey was

aware of the fact that plaintiff was not cooperating during the investigation based on her

meeting with plaintiff.  The evidence is not disputed that plaintiff did not cooperate with the

investigation by producing business records to support her contention that the numerous cash deposits to her accounts came from her two businesses; when asked, she did not produce old tax returns or a single receipt or any other business record that documented the income of the businesses.

The court also finds that the timing of the incident does not create a reasonable inference of intentional discrimination.  Prior to plaintiff's second meeting with Hilyer, McCaskey had told her that she needed to show the investigators the source of her cash deposits to ensure her continued employment.  At the first meeting plaintiff told the investigators that the cash was generated by her two businesses; yet, plaintiff did not produce a single document to support her statement.  At the second meeting, she told Hilyer that her business tax records for previous years were not Hilyer's concern.  Assuming for purposes of summary judgment that Hilyer told plaintiff she was being investigated because of her race, McCaskey and Mead's decision to terminate plaintiff following this meeting does not support an inference that McCaskey and Mead decided to terminate plaintiff because of her race.  Plaintiff testified that McCaskey told her to give the investigators documentation to support her cash deposits.  (Doc. 18, Ex. 1 at 152.)  At her second meeting, plaintiff did not produce documents to support her cash deposits and she told Hilyer that her business tax returns were not her concern.  The only inference supported by McCaskey and Mead's termination following the second meeting is that plaintiff was terminated because of her failure to document the source of her cash deposits.

19

The court notes that Hilyer did not recommend plaintiff's termination; rather she reported the results of her investigation. Nevertheless, even if the court assumes that Hilyer had recommended plaintiff's termination and recommended the termination on the basis of race,[5] plaintiff still has not established a prima facie case because the record evidence does not support an inference that her race or Hilyer's alleged tainted recommendation caused plaintiff's termination. In this circuit

> When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity. Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was the actual cause of the other party's decision to terminate the employee.

*Stimpson v. City of Tuscaloosa*, 186 F.2d 1328, 1331 (11th Cir. 1999.) Nothing in the record indicates that Hilyer's assumed racial animus, and not plaintiff's failure to cooperate with the investigation, caused McCaskey and Mead to decide to terminate plaintiff.

Because plaintiff has not established a prima facie case of discrimination, or otherwise shown sufficient evidence from which a reasonable jury could find racial animus caused McCaskey and Mead to terminate her, plaintiff's termination claims are due to be dismissed.

---

[5]The court notes that Hilyer's alleged remark only related to why plaintiff was investigated. Therefore, such comment alone does not support a reasonable inference that Hilyer recommended plaintiff be terminated and that such recommendation was tainted by a racial bias.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and that defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment, (doc. 17),  will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 2nd day of October, 2006.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE

21